Raphael **GREGORIAN** and California International Trade Corporation, Plaintiffs,

v.

**IZVESTIA; Ministry of Foreign Trade of the Union of Soviet Socialist Republics; V/O Medexport, USSR; V/O Licensintorg, USSR; Union of Soviet Socialist Republics; Mine Safety Applicances Company; and Catalyst Research, a division of Mine Safety Appliances Company, Defendants.**

No. CV 85–0100–KN.

United States District Court, C.D. California.

April 5, 1987.

Gerald L. Kroll and Beth E. Yoffie, of Kroll & Lindstrom, Los Angeles, Cal., for plaintiffs.

Sol Scope, of Margolis, McTernan, Scope & Epstein, Los Angeles, Cal., Martin Popper and John Mage, of Wolf, Popper, Ross, Wolf & Jones, New York City, for defendants.

David J. Anderson and Elizabeth Sarah Gere, of the Dept. of Justice, Washington, D.C., for the U.S.

## ORDER

KENYON, District Judge.

### I.

### BACKGROUND FACTS

Two of the defendants in this action, V/O Medexport and V/O Licensintorg, organs of the Union of Soviet Socialist Republics ("USSR"), have moved pursuant to Fed.R.Civ.P. 60(b)(4) and (b)(6) to set aside the default judgment entered against them and to dismiss the action pursuant to Fed. R.Civ.P. 12(b)(1) and (b)(2).

The documents before the Court establish the following: Plaintiff Raphael Gregorian and his company, California International Trade Corporation ("CIT"), exported medical and laboratory equipment to the USSR as a broker or sales representative on behalf of United States manufacturers. After approximately ten years of work in the Soviet marketplace, the Ministry of Foreign Trade of the USSR conferred upon CIT the coveted status of "accreditation." This gave CIT the right to have an office and personnel in Moscow.

The Ministry of Foreign Trade's accreditation of CIT in 1982 exemplified the high regard, prestige, and status Mr. Gregorian had achieved in the USSR. Awards and banquets ensued, but so did a string of disputes over USSR failure to pay for equipment it obtained through two State trading companies, V/O Licensintorg and V/O Medexport.

On November 10, 1984, the Ministry of Foreign Trade revoked CIT's accreditation certificate, which was due to expire one month later on December 10th. On November 18, 1984, *Izvestia*, a Soviet newspaper published by the Presidium of the Supreme Soviet of the USSR, printed an article with the headline, "Duplicitous Negotiator: A Story about a U.S. Firm and an Abuse of Trust." In the article, Mr. Gregorian was accused of bribery, smuggling, and other unscrupulous business practices. The article also intimated that Mr. Gregorian engaged in espionage against the USSR on behalf of U.S. intelligence services. *Izvestia* is sold throughout the world, including the United States.

After failing to resolve the disputes with the Ministry of Foreign Trade and obtain a retraction in *Izvestia*, plaintiffs filed suit in this Court on January 1, 1985. Named as principal defendants in the suit were *Izvestia*, V/O Licensintorg and V/O Medexport,

the USSR Ministry of Foreign Trade, and the USSR. Plaintiffs alleged that the Soviet entities, acting in concert, maliciously trumped up the espionage and dishonesty charges in order to avoid liability for their non-payment of goods and, more importantly, to do away with the cost of CIT's brokerage fees and sales commissions, thereby acquiring CIT's share of the profits.

Service of process was made on the Soviet defendants through the U.S. State Department under 28 U.S.C. § 1608(a). On May 31, 1985, the U.S. Embassy in Moscow transmitted the summons and complaint and enclosed copies of each to the Soviet defendants with a note advising them of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* The note also informed defendants that under applicable U.S. law, a defendant must file an answer to the complaint within 60 days or risk default. Accordingly, the U.S. Embassy advised the defendants to consult an attorney in the United States and informed them that "under U.S. law and procedure, neither the Embassy nor the Department of State is in a position to comment on the present suit." Embassy of the U.S.A. at Moscow, Note No. 925 (May 31, 1985).

The Foreign Ministry of the USSR responded to the Embassy's notes by rejecting service and returning the court documents. In doing so, it cited "the principle of sovereign equality of states," and stated that "the Soviet State and its organs enjoy immunity from the jurisdiction of foreign courts." Embassy Moscow's Internal Translation of the Soviet Union's Rejection of Service, attached to Department of State letter to Court of September 25, 1985.

The Court entered the Soviet defendants' default on July 31, 1985, and plaintiffs later moved for entry of default judgment on eleven separate claims. Finding jurisdiction under 28 U.S.C. § 1605(a)(2) and a satisfactory degree of evidence under 28 U.S.C. § 1608(e) for four of the contract claims and the one libel claim, the Court proceeded to order entry of the default judgment. The Court awarded damages on the contract claims in the amount of $163,-

165.17 on June 25, 1986 and general damages on the libel claim in the amount of $250,000.00 on July 8, 1986, thus totalling $413,165.17. Only plaintiffs appeared at those hearings. The Court, therefore, entered the judgment without the benefit of defendants' presence.

On October 14, 1986, U.S. Magistrate Ralph J. Geffen issued an order giving plaintiffs the right to attach and execute against any property in the United States of any of the five Soviet defendants. On November 12, 1986, plaintiffs began to execute on the judgment, first seizing a Cyrillic typewriter belonging to a U.S. correspondent for *Izvestia.* On November 20, 1986, Magistrate Geffen issued a Supplemental Order permitting plaintiffs to execute against funds held under the name of Bank for Foreign Trade, USSR, "for the benefit of V/O Medexport." In the past, the Bank of Foreign Trade had issued payment in dollars to CIT for defendants because Soviet law does not permit them to handle foreign currency. One day later, on November 21, 1986, American counsel filed a notice of entry of appearance on behalf of V/O Medexport and V/O Licensintorg.

Four days later, the United States Marshal served a writ of execution on two bank accounts of the Bank of Foreign Trade at BankAmerica International in New York ("BankAmerica"). BankAmerica withdrew the funds necessary to satisfy the judgment from the two accounts and segregated the funds in a bank-controlled account. The judgment, by this time, had grown to $456,413.34. The following day, November 26, 1986, BankAmerica sent a telex to the Bank of Foreign Trade in Moscow, informing the Soviet bank of the attachment of its accounts. Later that day, defendants V/O Medexport and V/O Licensintorg filed motions with this Court to vacate the judgment, stay its execution, and dismiss the case.

On December 4, 1986, the Court issued an order that stayed execution of the judgment and froze the funds of Bank of Foreign Trade held by BankAmerica.[1] At the

---

1. Actions in connection with the attachment of its bank accounts are the subject of another suit

request of plaintiffs, the Court also issued an Order to Show Cause Re Contempt directed against BankAmerica for its handling of the execution.

On January 23, 28, and 29, 1987, the Court held hearings on: 1) the Order requiring BankAmerica to Show Cause Re Contempt; 2) the Bank of Foreign Trade's Motion to Intervene for the limited purpose of establishing whether the funds held by BankAmerica were "for the benefit of V/O Medexport" as per Magistrate Geffen's Supplemental Order of November 20, 1986; and 3) defendants V/O Medexport's and V/O Licensintorg's Motion to Vacate the Judgment and Dismiss the Complaint.

On February 2, 1987, the Court issued two orders, one dismissing the Order to Show Cause Re Contempt against BankAmerica for its handling of the attachment of funds and the other vacating the writ of execution as not being in conformity with Magistrate Geffen's Supplemental Order of November 20, 1986. The second order also stayed execution on the judgment until the Court could decide defendants V/O Medexport's and V/O Licensintorg's Motion to Vacate the Judgment and Dismiss the Complaint. That motion is the subject of this decision.

## II.

### INTRODUCTION

#### A. *The Foreign Sovereign Immunities Act ("FSIA")*

The FSIA was enacted in 1976 to codify the restrictive principle of sovereign immunity. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7 (1976), *reprinted in* 1976 U.S. Code Cong. and Ad. News 6604, 6605–07 ("U.S. Code Cong. and Ad. News"). Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign state's public acts (*jure imperii*) and does not extend to suits based on its commercial or private acts (*jure gestionis*). The principle was previously adopted by the U.S. State Department in the now fa-

mous "Tate letter" of 1952 (*see* 26 United States Department of State Bulletin 984 (1952)), but the determination of immunity was made by the State Department and then suggested to the courts. The Act transferred the determination of immunity to the courts in order to strengthen the integrity of the legal process by which this determination was made. U.S. Code Cong. and Ad. News, *supra,* at 6606.

One of the motivating factors in the United States' adoption of the restrictive principle of sovereign immunity was the American experience in the immediate post-World War II era. Under the Marshall Plan, the United States became involved in foreign economic development on a grand scale, and litigation in foreign countries soon followed. Foreign counsel retained by the U.S. Department of Justice were routinely instructed to plead the principle of absolute sovereign immunity in almost every instance and to claim that all acts of the United States were immune from foreign jurisdiction. European courts, however, followed the restrictive principle of sovereign immunity and routinely denied the U.S. Government's pleas. Thus began the gradual process of adopting the principle of restrictive sovereign immunity that culminated in the enactment of the FSIA in 1976. U.S. Code Cong. and Ad. News, *supra,* 6607–08.

The USSR is well acquainted with the development of the principle of restrictive sovereign immunity. In the early years of the Soviet State, Soviet jurists viewed the restrictive concept of sovereign immunity and its denial of diplomatic status to Soviet trade missions as a bourgeois attack on the Soviet foreign trade monopoly. The Soviet Government's insistence on absolute immunity was seen as part of its struggle for equality between the capitalist and socialist systems. Academy of Sciences of the USSR, Institute of State and Law, International Law 305 (Moscow 1961), *reprinted in* J. Sweeney, C. Oliver & N. Leech, *The International Legal System* (2nd ed. 1981)

---

brought by the Bank of Foreign Trade against BankAmerica, nominal defendant, and plaintiffs and their counsel, Kroll and Lindstrom, princi-

pal defendants. In that action Bank of Foreign Trade is claiming $1.6 million in damages for the alleged wrongful attachment of its accounts.

("International Law"). As the leading proponent of the theory of absolute sovereign immunity, the USSR's activities gave impetus to the spread and development of the restrictive theory.

As early as 1925, the Supreme Court of Italy subjected the USSR to its jurisdiction when a Soviet trade mission became involved in litigation arising from its commercial activities. *Trade Delegation of the USSR v. Ditta Tesini e Malvezzi,* Giurisprudencia Italiana I, 204 (1925). By 1928 lower courts in Greece, despite Soviet pleas, refused to grant immunity to the USSR in a suit involving its commercial acts. *X v. USSR,* Ann.Dig. 172, No. 109 (1927–1928). In 1929 the Supreme Court of France upheld lower court actions against a Soviet trade mission in connection with its commercial activities in France. *USSR v. Association France-Egypt,* Dalloz Recueil Hebdomadaire 161 (1929).

Since United States codification of the theory of restrictive immunity in 1976, the USSR and its agencies and instrumentalities have been among the most frequently appearing FSIA defendants in U.S. courts. Today, the Soviet legal policy regarding restrictive immunity may be described as acknowledgment without acceptance. While insisting on the Soviet right to absolute sovereign immunity, defendants' counsel conceded the applicability of subject matter jurisdiction under the FSIA to plaintiffs' contract claims at a hearing before this Court on January 28, 1987. Defendants challenge only the exercise of personal jurisdiction over V/O Medexport and V/O Licensintorg, and whether immunity for libel is absolute.

Defendants V/O Medexport and V/O Licensintorg move for relief from the judgment on two grounds: first, that it is void pursuant to Fed.R.Civ.P. 60(b)(4) and second, that exceptional circumstances justify relief pursuant to Fed.R.Civ.P. 60(b)(6). For the reasons discussed below, the Court GRANTS partial relief on the first ground, and DENIES relief on the second ground. The Court will first examine the application of Rule 60(b)(4) to the libel claim and then to the contract claims. Finally, the Court will explore the applicability of Rule 60(b)(6) to any remaining claims.[2]

B. *Relief Under Fed.R.Civ.P. 60(b)(4)*

██ Defendants' position that the judgment is void is based on two arguments: this Court lacked subject matter jurisdiction over the libel claim, and lacked personal jurisdiction over V/O Medexport and V/O Licensintorg on the contract claims when it entered judgment.[3] Unlike the other subsections of Rule 60(b), subsection (4) does not place any time limit on, nor does it give the court discretion in, its application. A decision is either void or valid. The validity of the decision hinges on a legal determination. *Thos. P. Gonzalez Corp. v. Consejo Nacional de Costa Rica,* 614 F.2d 1247, 1256 (9th Cir.1980). Once a court makes a finding that a decision was void, it must proceed to simultaneously dismiss the action on which the decision was made. *See Castro v. Saudi Arabia,* 510 F.Supp. 309, 311 (W.D.Tex.1980).

III.

SUBJECT MATTER JURISDICTION ON THE LIBEL CLAIM

After a series of contract disputes with CIT and one month prior to the expiration of its two-year certificate of accreditation,

2. Judicial economy compels this procedure, for if a judgment is void under Rule 60(b)(4) it must be dismissed as well as set aside, thereby relieving the court of the necessity of deciding a Rule 60(b)(6) motion.

3. While only V/O Medexport and V/O Licensintorg have appeared to present the motion for setting aside the default judgment, the Court will address the judgment as it pertains to all defendants. This, too, is done in the interest of judicial economy, for in deciding this motion it was possible to find V/O Medexport and V/O Licensintorg lacking for subject matter jurisdiction as to the libel claim without ever addressing nature of the libel claim itself. Such a finding would resolve little. It is also interesting to note that to some extent, the moving defendants depend on their separation from the Government of the USSR for their argument on personal jurisdiction, and on their unity with the Government for their argument on subject matter jurisdiction.

the Ministry of Foreign Trade terminated CIT's accreditation. Had this been the extent of the Soviet Government's actions, CIT would have been able to continue representing U.S. manufacturers in the USSR, but would not have been able to maintain an office in Moscow. One week later, however, *Izvestia* printed an article (more closely resembling an editorial in American terms) that accused Mr. Gregorian of engaging in intelligence gathering, smuggling, and bribery. The article destroyed Mr. Gregorian's business representing American manufacturers in the USSR and seriously harmed his ability to do business with other countries as well.[4]

Insofar as Mr. Gregorian had built most of his business on trade with the USSR, it strikes the Court as highly unlikely that either he would have jeopardized his business by changing his business practices after more than a decade, or that such unscrupulous behavior would have gone unnoticed by the Soviet authorities until 1984. Combined with the fact that the article in *Izvestia* did not cite any evidence based on the personal knowledge of even one Soviet citizen, it appears that the charges were fabricated.

While noticing the unjustified injury to Mr. Gregorian resulting from the accusations in *Izvestia*, this Court must also conclude that the libel was a wrong for which there is no legal remedy. In reaching this conclusion, the Court has had to steer its way through a variety of complicated, confusing, seemingly self-contradictory, and yet reasonable interpretations of the FSIA. Ultimately, the simplest interpretation of the statute—that the drafters never meant for any confusion to exist—is the reasoning that the Court has adopted.

The principle of restrictive immunity for commercial activities is embodied in § 1605(a)(2) of the FSIA, the so-called "commercial activity exception." This exception, under which plaintiffs have brought this lawsuit, is the most frequently utilized of the Act's exceptions, both because it lies at the heart of the Act and

because its convoluted language creates a legal labyrinth that lends itself to assorted interpretations. Section 1605(a)(2) states that

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\*    \*    \*    \*    \*    \*

(2) in which the action is based

(i) upon a commercial activity carried on in the United States by the foreign state; or

(ii) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or

(iii) upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States....

Libel is specifically addressed later, in sub-paragraph (a)(5)(B), which continues the denial of immunity to foreign states in any case:

(5) *not otherwise encompassed in paragraph (2) above*, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; *except this paragraph shall not apply to* —

\*    \*    \*    \*    \*    \*

(B) any claim arising out of malicious prosecution, abuse of process, *libel*, slander, misrepresentation, deceit, or interference with contract rights. (emphasis added)

It would seem then, that a libel claim must be encompassed in paragraph (2) in order to avoid a fatal application of subparagraph (5)(B). Plaintiffs claim coverage by all three clauses of paragraph (2), al-

---

**4.** Plaintiffs presented evidence that CIT's nascent efforts to establish trade with the People's

Republic of China were all but destroyed by the article in *Izvestia*.

though the most favorable reading derives from the third clause: "an action based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

The confusing wording, however, precluding immunity in any *case* in which the *action* is based upon an *act* in connection with commercial *activity*, invites the Court to ask whether the Congress meant "action" in the common legal sense of the word, meaning lawsuit. Under this interpretation, once a lawsuit is based upon a commercial dispute, as is this one, all claims deriving from the dispute may be adjudicated. *See Matter of Rio Grande Transport, Inc.*, 516 F.Supp. 1155, 1162–1164 (S.D.N.Y.1981), *rev'd on other grounds*, 770 F.2d 262 (2nd Cir.1985). This interpretation is supported by a "concursus" policy that favors the adjudication of all related claims in one proceeding. It would limit the doctrine of sovereign immunity to suits arising out of a public function. *Sea Transport Corp., S/T Eagle Voyager v. S/T Manhattan*, 405 F.Supp. 1244, 1245 (S.D.N.Y.1975).

It was under this understanding that another decision involving the Soviets and libel denied relief to a plaintiff while leaving the door open for future actions such as this one. In *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 855–856 (S.D.N.Y.1978), a Soviet news agency was accused of libel. Because the alleged libel was not "in connection with a commercial activity," the court denied jurisdiction, finding that the action could not overcome the libel bar of sub-paragraph (a)(5)(B).

In another action involving the USSR, a court, citing *Yessenin-Volpin*, flatly stated that "[t]he restrictions embodied in subsection (a)(5)(B) were *not* intended to restrict the scope of the commercial activity exception in subsection (a)(2)." *United Euram Corporation v. USSR*, 461 F.Supp. 609, 612 (S.D.N.Y.1978) (emphasis added). The court proceeded to allow the plaintiff to plead a cause of action against the USSR alleging interference with contract rights,

a claim otherwise specifically barred by (a)(5)(B).

If taken to the extreme, such interpretations would invite courts to pass judgment on the public acts of a foreign government so long as they were based on commercial disputes. Another FSIA decision, however, also involving the Soviets, reminds the Court that the "doctrine of sovereign immunity arises from a mutual belief held by all nations that one sovereign will not and should not sit in judgment of the public acts of another." *Frolova v. Union of Soviet Socialist Republics*, 558 F.Supp. 358, 360 (N.D.Ill.1983), *affirmed*, 761 F.2d 370 (7th Cir.1985). Respect for a sovereign's public acts is necessary to keep courts away from those areas that touch very closely upon the sensitive nerves of foreign countries.

Several problems, however, may arise from this simple statement: 1) a foreign country may escalate a simple commercial dispute into a serious irritant in foreign relations in order to escape U.S. jurisdiction; 2) some governments that control a great deal are often obsessed by the few things they do not control; and 3) despite these problems, it remains a principal purpose of the FSIA to conform U.S. immunity practice to the practice in virtually every other country in the world, where sovereign immunity decisions are made exclusively by the courts and not by foreign affairs agencies. U.S. Code Cong. and Ad. News, *supra* at 6606. Consequently, in spite of the language of paragraph (a)(2) that subsumes all claims in the action, the Court is compelled to apply the same analysis to the libel claim that it must apply to the contract claims.

Plaintiffs allege that the defamatory article in *Izvestia* resulted from Mr. Gregorian's pursuit of contract claims against the defendants. Rather than settling the contract claims, the defendants resorted to fabricating accusations against Mr. Gregorian. They then caused the accusations to be published and distributed throughout the world, including the United States. Thus, plaintiffs assert that the libel was

commercial and therefore encompassed in § 1605(a)(2).

■ The FSIA provides distressingly little guidance to determine whether a given activity is commercial or public. Congress recognized that by not defining "commercial activity" with precision, courts would have a "great deal of latitude in interpreting the exceptions to immunity." *Id.* at 6615. It is not important that the actor is governmental; the question is whether the government was wearing its sovereign rather than its commercial hat at the time in question. *De Sanchez v. Banco Central De Nicaragua,* 770 F.2d 1385, 1393–1394 (5th Cir.1985).

■ In § 1603(d), the FSIA instructs the Court to contemplate the essential nature, not the purpose, of the activity in determining whether an activity is commercial or public.[5] If the activity is a type that a private person would normally engage in for profit, it is generally clearly "commercial" within the meaning of the commercial activity exception to the FSIA. *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1109 (5th Cir.1985).

The Court, however, is perplexed as to what political-economic system's criteria to apply, both to the publication of *Izvestia* in general, and the libel in particular. In the West, the media are typically owned and operated by private individuals, although they are often seen as possessing the power, if not the status, of a branch of government. In the USSR, by contrast, Article 6 of the Soviet Constitution stipulates that the means of communication are property of the state. Thus, "the People," but not persons, own the media. Defendants wish to confine the commercial aspects of a newspaper to its distribution or sale. In this view, plaintiffs' claims have nothing to do with commercial activity. The Court's view is that just as the manufacturing and packaging of any product is an essential part of the commercial activity that leads to the product's sale, so too is the gathering, editing, and publishing of the news a part of the commercial activity that leads to a newspaper's sale and circulation.

With regard to the nature of the libel itself, a Canadian press magnate, Lord Beaverbrook, once told an aspiring journalist that starting a vendetta against someone is the best way to get people reading one's columns. The defendants, by contrast, term the accusations against Mr. Gregorian "official commentary."[6]

*Yessenin-Volpin,* the only other case under the FSIA directly addressing libel,[7] offers little help. The court in that instance stated that "the relevant issue ... is not whether [the news agencies] engage in commercial activity but whether their alleged libels were 'in connection with a commercial activity.'" 443 F.Supp. at 856. The libel directed against Mr. Gregorian was "in connection with" a commercial dispute, so presumably it would satisfy the *Yessenin-Volpin* test. The court proceeds, however, to describe the news organizations' collaboration with the government in publishing the article as "one instance of a cooperative arrangement with a government agency," and therefore not commercial. *Id.* at 856.

---

5. 28 U.S.C. § 1603(d) states: "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."

6. *Izvestia* is identified as the "Organ of the Soviets of Working People's Deputies," published by The Presidium of the Supreme Soviet of the USSR. Plaintiffs do not dispute its sovereign status. If, however, *Izvestia* is a separate juridical person, should it not be held responsible for reporting the opinions of another juridical enti-

ty as fact, rather than attributing those opinions to their proper source? Conversely, if *Izvestia* and other Soviet entities are all "official" entities of the State, how may they assert that they are "juridical persons," a legal term of art that usually means, prima facie, that the entity involved is separate and distinct from the government?

7. *Boland v. Bank Sepah-Iran,* 614 F.Supp. 1166 (S.D.N.Y.1985), involved a claim of libel against an agency or instrumentality of the government of Iran. However, the libel claim in that case was adjudicated within the framework of rules of an international arbitral tribunal at the Hague, not the FSIA.

■ This characterization, though, is a non-sequitur capable of describing any news activity involving government sources. In this case it could describe defendants' capacity to have whatever they wish published, or it could describe the newspaper's disregard for the truth. In either event, a government's behavior in a commercial dispute does not acquire a public nature simply by being manifested in a government-owned newspaper that enjoys mass circulation. A public nature and an act of public power are not always the same thing.

In sum, the distinction required by the FSIA between the nature and purpose of an activity is often highly abstract, even when evaluating activities within the same value system. It is particularly ill-suited, however, for the political and economic concepts that exist in socialist states, such as the Soviet Union. The problem is further compounded by activities such as those of the mass media, which have a public character even when performed by private entities. Finally, the task in this case is rendered impossible when one recalls that Congress' objective in focusing the courts on the "nature" versus "purpose" distinction was to preclude foreign governments from always being able to claim sovereign immunity. Even when a government enters the marketplace to buy and sell goods, its ultimate motivation is not profit, but rather the social good. *De Sanchez*, 770 F.2d at 1393. Indeed, the differentiation between the nature and purpose of an activity may not always be possible.

Last year, in pondering the "nature" of defendants' defamatory activities, the libelous article itself, and *Izvestia* and Soviet news activities in general, this Court concluded that plaintiffs' claim was sufficiently commercial that it justified an exception to immunity under § 1605(a)(2) of the FSIA. The claim thus avoided the fatal bar of subsection (a)(5)(B) and the Court proceeded to the entry of a default judgment.

At this point in time the Court pauses to consider from a different perspective a more troubling and basic aspect of the "na-ture" versus "purpose" puzzle. If the commercial activity exception of § 1605(a)(2) can be stretched in such a way as to swallow the immunities enumerated in sub-paragraph (a)(5)(B), the FSIA would expose foreign states to United States jurisdiction for actions on which the United States government itself is immune. The legislative history of the FSIA itself states only that "the [claims against which foreign states are immune] provided in sub-paragraphs (A) and (B) of 1605 (a)(5) correspond to many of the claims with respect to which the U.S. Government retains immunity under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. 2680 (a) and (h)." U.S. Code Cong. and Ad. News, *supra* at 6620. The FTCA is a codification of the principle of restrictive immunity with regard to the U.S. Government on a domestic level.

Section 2680(h) of the FTCA, however, unlike § 1605(a)(5)(B) of the FSIA, does not create any ambiguous connections to other code sections that expose the government to suit. It states flatly that the United States government is immune from

> Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, *libel,* slander, misrepresentation, deceit, interference with contract rights. (emphasis added)

Accordingly, United States courts have consistently barred claims of libel against the United States Government, no matter how pleaded. *See Art Metal-U.S.A., Inc. v. United States,* 753 F.2d 1151, 1156 (D.C. Cir.1985); *see also Hoesl v. United States,* 451 F.Supp. 1170, 1178–80 (N.D.Cal.1978), *affirmed,* 629 F.2d 586 (9th Cir.1980). Even libel claims of a clear commercial nature are barred. *See Bosco v. U.S. Army Corps of Engineers, Fort Worth District,* 611 F.Supp. 449, 452–453 (D.C. Tex.1985) (Government stated that a subcontractor bidding on a project "lacked a satisfactory record of integrity.").

■ While § 1605 (a)(2) and (5) contain language which may reasonably be read to create a possible loophole for libel claims such as the one in this action, it strikes the Court as unlikely that Congress wished to

create a double standard under which foreign sovereigns could be sued in United States courts on tort claims, such as libel, for which the United States Government itself is immune. Despite the jumbled draftsmanship of § 1605(a)—or perhaps because of it—the Court holds that Congress, in tracking the language of § 2680(h) of the FTCA in § 1605(a)(5)(B) of the FSIA, intended that foreign governments remain immune from libel and other claims to the same extent that the United States itself is immune under the FTCA.

■ The Court, therefore, finds its previous judgment as to libel to be lacking for subject matter jurisdiction under 28 U.S.C. § 1605, sets it aside as void pursuant to Fed.R.Civ.P. 60(b)(4), and dismisses the libel claim pursuant to Fed.R.Civ.P. 12(b)(1).

## IV.

### THE CONTRACT CLAIMS

Having found the default judgment on the libel claim to be void under Fed.R. Civ.P. 60(b)(4), the Court sets aside and dismisses only that part of the judgment pertaining to the libel claim. The lack of subject matter jurisdiction on the libel claim is silent as to the validity of the judgment on the contract claims. Therefore, unless the Court now determines that it did not have personal jurisdiction over defendants with regard to the contract claims or that the judgment should be set aside under Rule 60(b)(6), the judgment on the contract claims stands as valid.

### A. *Subject Matter Jurisdiction*

Subject matter jurisdiction for plaintiffs' contract claims is found in the third clause of 28 U.S.C. § 1605(a)(2): "the action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act caused a direct effect in the United States."

This action is based upon contractual disputes between plaintiffs and Soviet defendants that took place in the USSR in connection with trading activity of the USSR with the United States. The acts complained of

resulted in the failure of Soviet and American banks to transfer payment from the USSR to plaintiffs in California. It further resulted in financial loss, including the disruption of CIT's relations with its U.S. suppliers. Additionally, even though plaintiffs may not state a claim against the USSR for libel, the defamatory *Izvestia* article, which was printed in the USSR and circulated in the United States, may be seen as a direct effect of the defendants' acts. Thus, the requirements of § 1605(a)(2) are satisfied. *See Texas Trading & Mill Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 311–313 (2nd Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Indeed, application of the FSIA to instances "when U.S. businessmen sell goods to a foreign state trading company" was specifically anticipated by Congress. U.S. Code Cong. and Ad. News, *supra,* at 6605.

### B. *Personal Jurisdiction*

A literal reading of 28 U.S.C. § 1330(b) suggests that the Court has personal jurisdiction over a foreign state whenever an exception to sovereign immunity exists and proper service has been made. *McKeel v. Islamic Republic of Iran,* 722 F.2d 582, 588, 589–90 n. 10 (9th Cir.1983), *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984). The Court finds that these statutory requirements have been met. The legislative history makes clear, however, that due process notions of minimum contacts are incorporated into the provisions. *See Thos. P. Gonzalez Corp.,* 614 F.2d at 1254; *see also Waukesha Engine Division, Dresser Americas, Inc. v. Banco Nacional de Fomento Cooperativo,* 485 F.Supp. 490, 492 (D.C.Wis.1980).

■ Consequently, courts have consistently applied constitutional due process standards to the FSIA. *Texas Trading* 647 F.2d at 313–15. If the Court finds that subjecting the defendants to its jurisdiction offends "traditional notions of fair play and substantial justice," *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the Court must declare the decision void. *Thos. P. Gonzalez Corp.,* 614 F.2d at 1256;

*accord Covington Industries, Inc., v. Resintex A.G.,* 629 F.2d 730, 732 (2nd Cir. 1980).

In *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984), the Supreme Court established that in order for a court to determine if it has general *in personam* jurisdiction over a defendant, it must explore the nature of any contacts between the defendant and the forum to see whether they constitute the kind of continuous and systematic general business contacts that will allow maintenance of a suit without offending due process. *See also Data Disc, Inc. v. Systems Technology Associates, Inc.,* 557 F.2d 1280, 1287 (9th Cir.1977) (contacts must be "substantial" or "continuous and systematic").

*Helicopteros* was based on diversity, thereby justifying the Supreme Court's reliance on the limitations of a state long-arm statute. The Court in *Texas Trading,* however, noting (1) that the FSIA provides its own long-arm statute in § 1330, (2) that § 1608 provides for worldwide service of process, and (3) that FSIA cases arise under federal statute, ruled that "the relevant area in delineating contacts is the entire United States, not merely New York [the forum state]." *Meadows v. Dominican Republic,* 628 F.Supp. 599, 606 (N.D.Cal. 1986); quoting *Texas Trading,* 647 F.2d at 314.

V/O Medexport and V/O Licensintorg are two trading organizations of the USSR. Plaintiffs have alleged that these two entities acted as agents or alter egos of each other, the Ministry of Foreign Trade, and the USSR in breaching the contracts in question. Thus, the general activity of the Ministry and the State may also be relevant in establishing personal jurisdiction.

In addition, the activities of other agents of V/O Medexport and V/O Licensintorg are relevant. *See Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 120–121 (2nd Cir.1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968). The pay-

ment activities of .BankAmerica, Chase Manhattan Bank, and the Bank of Foreign Trade in New York and California are attributable to defendants. If these banks had not at various times performed for defendants, the entire payment mechanism supporting the relationship between plaintiffs and defendants would have ceased to exist. Defendants would have been compelled to make the payments directly, a function which they are prohibited from executing under USSR law. *See Texas Trading,* 647 F.2d at 314.

In 1961, the prestigious Academy of Sciences of the USSR, Institute of State and Law, described the legal status of a Soviet trade mission, the predecessor to the trading organization, such as defendants: "A trade mission is not a legal person. The treasury of the USSR is liable for its commitments, since the Soviet State is the subject of foreign trade transactions which it concludes." International Law, *supra,* at 298. While Soviet law may have since changed, perhaps conferring juridical separateness upon State trading organizations,[8] the essential realities of the organizations' existence do not seem to have changed.

The Soviet Government's Certificate of Accreditation, the basis on which many of CIT's activities were permitted, states that while CIT could deal with Soviet organizations, "concerning questions of buying and selling, [CIT must operate] ... only through the Ministry of Foreign Trade...." It would thus appear that V/O Medexport and V/O Licensintorg were either required by Soviet law to act in concert with the Ministry of Foreign Trade in finalizing any arrangement with plaintiffs, or they are subdivisions of the Ministry of Foreign Trade lacking juridical personality. Consequently, the Court found them to be acting as either agents or alter egos of the Ministry. In either event it would seem that defendants ask for the rights of independent, separate juridical persons, though they have not in fact acted as independent, separate juridical persons.

---

**8.** While the Court does not have evidence to this effect, it assumes that all business enterprises maintain separate identities within the USSR, if,

for no other reason than to facilitate the evaluation of their performance.

It seems ironic that defendants today wish to juridically separate themselves from the Soviet State. In 1961, the Academy of Sciences of the USSR, Institute of State and Law, proudly noted:

> The consistent and resolute policy of the Soviet Government led to the defeat of all attacks upon the foreign trade monopoly of the Soviet State and upon the organs carrying it out. The rights of the Soviet State in exercising its monopoly of foreign trade are now recognized by the absolute majority of states.

International Law, *supra,* at 298.

Today U.S. courts recognize the Soviet State's monopoly over its foreign trade. As part of such recognition, however, this Court concomitantly views defendant trade organizations, both generally and specifically with regard to this action, as integral parts of that State which enjoys representation through diplomatic and trade missions around the world. Such missions are maintained by the government on behalf of and for the benefit of all of its constituent parts. *See Meadows v. Dominican Republic,* 628 F.Supp. at 608; *see also Texas Trading,* 647 F.2d at 314.

■ The Court takes judicial notice of the fact that two such Soviet missions are the embassy in Washington, D.C. and the consulate in San Francisco, California. Through these missions, the USSR, the Ministry of Foreign Trade, and V/O Medexport and V/O Licensintorg maintain a substantial and continuous presence in the United States and California. They employ trade and economic attachés, invoke the benefits of California and U.S. law, and generally avail themselves of the privileges of conducting business here. Personal jurisdiction is therefore appropriate.

The issues of agency, alter ego, and the juridical separateness of V/O Medexport and V/O Licensintorg go directly to the issue of the validity of the judgment. As the court in *Meadows* noted, "[t]he Supreme Court squarely has held that the FSIA does not affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a for-

eign state." 628 F.Supp. at 608; *citing First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 620, 103 S.Ct. 2591, 2596, 77 L.Ed.2d 46 (1983). Indeed, the legislative history also states quite clearly:

> The bill is not intended to affect the substantive law of liability. Nor is it intended to affect either diplomatic or consular immunity, or the attribution of responsibility between or among entities of a foreign state; for example, whether the proper entity of a foreign state has been sued, or whether an entity sued is liable in whole or in part for the claimed wrong.

U.S. Code Cong. and Ad. News, *supra,* at 6610.

The Soviet government should have been well aware of the predicament it would face in this case. In *United Euram Corporation,* 461 F.Supp. at 612, the USSR and its Ministry of Culture sought to dismiss claims against them by arguing that a third Soviet defendant was a distinct entity. The plaintiff's allegations, however, that negotiations were conducted by officials of both the entity and the Ministry, and that the entity did not sign the contracts until they were finally approved by the Ministry were sufficient to withstand a Rule 12(b) motion to dismiss.

Defendants' motion here is essentially the same. At this stage, however, after a judgment has been entered, issues of substantive law, such as agency, alter ego and juridical separateness are not open for consideration. An error in interpreting material facts is not equivalent to acting with total lack of jurisdiction. Therefore, even if the Court were in error, it would not render the decision a complete nullity. "A void judgment, as opposed to an erroneous one, is legally ineffective from inception." *Jones v. Giles,* 741 F.2d 245, 248 (9th Cir. 1984).

Accordingly, the Court DENIES defendants' motion to set aside the judgment and dismiss the contract claims pursuant to Fed.R.Civ.P. 60(b)(4) and 12(b)(2).

## V.

### RELIEF UNDER FED.R.CIV.P. 60(b)(6)

Having found the default judgment void as to the libel claim and valid as to the contract claims under Rule 60(b)(4), the Court must now determine whether there is reason to vacate the remaining judgment on the contract claims pursuant to Rule 60(b)(6).

Rule 60(b)(6) provides courts with wide discretion to take action appropriate to accomplish justice. *Klapprott v. U.S.*, 335 U.S. 601, 614–615, 69 S.Ct. 384, 390–391, 93 L.Ed.266; *modified*, 336 U.S. 949, 69 S.Ct. 877, 93 L.Ed. 1105 (1949). If a court cannot find justification to set aside a judgment within the first five subsections, subsection (6) of Rule 60 allows a court to vacate a judgment "for any other reason justifying relief." The Rule's only limitation is that "the motion shall be made within a reasonable time." *See Bookout v. Beck*, 354 F.2d 823, 825 (9th Cir.1965).

The timeliness of a Rule 60(b)(6) motion should be evaluated in the context of other 60(b) motions. Under subsections (1), (2), and (3) of Rule 60(b), if a default occurs as a result of mistake, inadvertence, surprise, excusable neglect, newly discovered evidence that could not have been discovered in time to move for a new trial, or misconduct of the adverse party, defendant has one year after the judgment to file a motion for relief. Presumably, therefore, in evaluating a Rule 60(b)(6) motion, if a party were not innocent in allowing the default judgment to occur, less than a one year allowance should apply. If the party were unable to defend against the action, longer than one year should be allowed. In essence, innocence of the defaulting party is a major criterion in determining timeliness.

In this case, V/O Medexport and V/O Licensintorg filed a motion with this Court to vacate the default judgment in late November of 1986, approximately three months after the judgment was registered. In temporal terms, three months is not a long time. What troubles the Court, however, is that defendants' presence did not come about by virtue of a recognition that the United States subscribes to the doctrine of restrictive immunity, that this doctrine as codified in the FSIA applies to the USSR as it does to all nations, or that this law respectfully requested their presence in court. Rather, their appearance was brought about by plaintiffs' efforts to execute on the judgment. The resulting motion was thus timely, but only in the sense of occurring at an opportune moment. Timeliness, then, must be tied to the substantive reasons justifying relief from the judgment.

█ In deciding whether to grant a Rule 60(b)(6) motion, the Court balances two conflicting policy considerations. First, reflecting the view that default judgments are generally disfavored, relief is to be liberally applied. Second, a compelling interest in the finality of judgments requires the presence of extraordinary circumstances to vacate a default judgment. In balancing these opposing considerations, the Ninth Circuit has established that three factors should be considered in deciding whether to vacate a judgment pursuant to Rule 60(b): (1) prejudice to the plaintiff; (2) the non-existence of a meritorious defense; and (3) culpable conduct of the defendant leading to the default. *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 815 (9th Cir.1985). If any one of these factors is present, the motion is properly denied.

First, prejudice to plaintiffs from vacating the default judgment would not be significant, at least in the sense that plaintiffs would face the same basic circumstances they would have faced had defendants appeared in the first instance. Second, defendants deny the truth of plaintiffs' claims. If the facts that defendants allege are true, they would prevail. The defense, therefore, is meritorious. This brings the Court to the last factor: Whether culpable conduct of defendants led to the default judgment.

Defendants and the U.S. State Department, in requesting that the Court set aside the default judgment, claim that "a view contrary to that of U.S. law regarding sovereign immunity cannot be characterized as

culpable conduct." The Court does not take issue with the defendants' continued adherence to their view that under international law the USSR is absolutely immune from suit in foreign courts. It is not adherence to a view that is contrary to law, however, which constitutes culpable conduct; it is action upon that belief.

Tax protesters, draft evaders, and others may have bona fide beliefs to which no U.S. court questions their entitlement. When these protesters act upon those beliefs, however, and refuse to pay taxes, refuse to register for the draft, or refuse to appear in court when summoned, they have engaged in culpable conduct. In refusing to appear before this Court, defendants conducted themselves in a culpable manner that led to the default. They, like other protesters, may freely disagree with the law; they may even protest the law. When they do not comply with the law, however, they must live with the legal consequences. "The broad power granted by clause (6) is *not* for the purpose of relieving a party from free, calculated and deliberate choices he has made. A party remains under a duty to take legal steps to protect his own interests." *Ackermann v. U.S.*, 340 U.S. 193, 197, 71 S.Ct. 209, 211, 95 L.Ed. 207, 212 (1950)(emphasis added).

Relief under subsection (6) of Rule 60(b) has been said to be reserved for "extraordinary circumstances." *Corex Corp. v. United States*, 638 F.2d 119, 121 (9th Cir. 1981). The Court's review of such a discretionary standard would not be complete without determining whether the foreign policy overtones that this case has assumed present the "extraordinary circumstances" that justify setting aside the judgment.

*Jackson v. People's Republic of China*, 596 F.Supp. 386 (N.D. Alabama, 1984), *affirmed*, 794 F.2d 1490 (11th Cir.1986), *rehearing denied*, 801 F.2d 404 (11th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987), presented a situation similar to the one here. In *Jackson*, a district court, pursuant to Rule 60(b)(6), vacated a default judgment against the People's Republic of China ("PRC") for debts an earlier Chinese

government incurred in 1911. It did so for several reasons. First, until January 1, 1979 the United States recognized the Republic of China on Taiwan, not the PRC, as the sole government of China. The FSIA had been implemented only two years earlier in 1977. Thus, when the lawsuit commenced in 1979, the PRC had lacked full diplomatic relations with the United States for thirty years and was confronted with the confusion of interpreting a new law. The United States, on the other hand, was placed in the sensitive position of having to explain to its new relation that the issue of sovereign immunity was decided by U.S. courts and could not be determined by the State Department. 794 F.2d at 1495.

By contrast here, the Soviet Union has enjoyed full diplomatic relations with the United States for the better part of a century, and the FSIA had been in operation for almost a decade when this lawsuit began. While the USSR maintains an adherence to the doctrine of absolute sovereign immunity, as does China, the Soviets have long been aware that the Western nations have all adopted the principle of restrictive immunity, that the United States subscribes to this principle, that the principle is codified in the FSIA, and that the FSIA may require a foreign government's presence in court.

Second, the PRC had refused to submit to U.S. jurisdiction because, in addition to its differing conception of sovereign immunity, it cited the doctrine of non-liability for "odious debts" incurred by earlier Chinese governments. This constituted an issue of genuine historic significance for the Chinese and exceptional circumstances justifying relief from the default. *Id.* at 1495. Defendants here claim only that the USSR steadfastly adheres to the concept of absolute sovereign immunity. They even acknowledge the Court's subject matter jurisdiction over the contract claims. The breach of a contract to purchase medical equipment is exactly the type of politically non-sensitive obligation that the concept of restrictive immunity and the FSIA anticipated. U.S. Code Cong. and Ad. News, *supra*, at 6605.

Third, in *Jackson*, because of the long absence of relations between the United

States and the PRC, there were only limited communications between the two governments on legal matters, leaving PRC authorities generally unfamiliar with U.S. judicial practices and procedures. The Soviets, by contrast, rank among the countries with the most experience and sophistication in dealing with the FSIA. They are fully familiar with its provisions and have appeared through counsel in numerous cases to contest its validity. *See Houston v. Murmansk Shipping Co.*, 667 F.2d 1151 (4th Cir.1982); *Bland v. Union of Soviet Socialist Republics*, 17 Av.Cas (CCH) 17,-530 (E.D.N.Y.1982); *Harris v. VAO Intourist, Moscow*, 481 F.Supp. 1056 (E.D.N.Y.1978); *United Euram v. Union of Soviet Socialist Republics*, 461 F.Supp. 609 (S.D.N.Y.1978); *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849 (S.D.N.Y.1978); *In re Estate of Petro Semeniw*, 78 Ill.App.3d 570, 33 Ill.Dec. 731, 397 N.E.2d 64 (1st Dist.1979); *In re Estate of Bari Nabif*, 69 A.D.2d 904, 415 N.Y.S.2d 901 (2d Dept.1979). Thus, the Soviet refusal to submit to the jurisdiction of the Court in this case can in no way be contrued as innocent.

Last, in the United States statement of interest in *Jackson*, Secretary of State Shultz urged that the default be set aside because "[t]he United States believes that the PRC's initial failure to appear in these proceedings was based on its belief that international law did not require it to do so...." 794 F.2d at 1495. He thus affirmed the basic innocence of the PRC as the foundation for setting aside the default. He concluded his statement by saying that "[p]ermitting the PRC to have its day in court will significantly further United States foreign policy interests, conversely, denying it that day in court is likely to have a negative impact on United States interests." 794 F.2d at 1495.

The State Department, in one of its statements of interest in this case, echoes the conclusory foreign policy warnings from *Jackson*, but cites none of the innocence that entitled the Chinese to the beneficence of the court. Without such a justification, the echoes sound hollow, constituting precisely the type of intermeddling with the judicial process that the FSIA was designed to prevent. The legislative history of the FSIA states:

> A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process. The Department of State would be freed from pressures from foreign governments to recognize their immunity from suit and from any adverse consequences resulting from an unwillingness of the Department to support that immunity.

U.S. Code Cong. and Ad. News, *supra*, at 6606.

■■■ Setting aside the default judgment for the justifications that the State Department has provided would represent a giant step backward to the days before the FSIA in which legal determinations were made by the executive branch and litigants were provided no predictability or assurance of due process. There is little that is extraordinary about the circumstances which brought about the default judgment; defendants' beliefs led them to a free, calculated, and deliberate choice not to appear when summoned. They may not now escape the consequences of their actions by exerting exactly the type of pressure that Congress has sought to eliminate. Accordingly, defendants' motion to set aside the default judgment pursuant to Fed.R.Civ.P. 60(b)(6) is DENIED.

## VI.

### CONCLUSION.

For the reasons stated, the Court DENIES defendants' motion to set aside the judgment as to the contract claims, GRANTS defendants' motion to set aside the default judgment as to libel, and DISMISSES the libel claim.