**Jacqueline Smith LeDONNE, Plaintiff,**

**v.**

**GULF AIR, INC., Defendant.**

**Civ. A. No. 88–0580–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 21, 1988.

**1402**

Richard C. Shadyac, Jr., Shadyac & Shadyac, Arlington, Va., for plaintiff.

Moffett B. Roller, Condon & Forsyth, Falls Church, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This diversity suit to enforce an Illinois default judgment presents threshold dispositive issues concerning the Foreign Sovereign Immunities Act ("FSIA" or "the Act"), 28 U.S.C. §§ 1603 *et seq.* Plaintiff, seeking to enforce the Illinois judgment, argues that the FSIA is inapplicable and, alternatively, that, even if applicable, the FSIA confers no immunity on Gulf Air because the conduct underlying the default judgment falls within the Act's "commercial activity" exception. *See* 28 U.S.C. §§ 1603(d), 1605(a)(2). Gulf Air responds, arguing for the applicability of the Act, the irrelevance of the exception and hence the protection of immunity. Gulf Air also argues that even if the exception applies to deprive Gulf Air of the FSIA's immunity, plaintiff's claim still fails because she failed to comply with the Act's service requirements.

Because the essential facts are undisputed, this matter is appropriate for summary disposition pursuant to Rule 56, Fed.R. Civ.P. For the reasons set forth here, the Court concludes that FSIA applies, that the commercial activity exception operates to deny immunity to Gulf Air, but that plaintiff's failure to comply with the Act's service provisions is fatal to her claim.

### Facts

Plaintiff, Jacqueline Smith LeDonne, is an Illinois citizen. Defendant, Gulf Air, Inc., (Gulf Air) is a joint stock company with limited liability created by a treaty among four Persian Gulf states: The Emirate of Abu Dhabi, the State of Bahrain, the State of Qatar and the Sultanate of Oman. These sovereign nations own 100% of Gulf Air's stock. Gulf Air is a foreign passenger and freight airline headquartered in Bahrain. From there it flies west as far as London and east as far as Hong Kong. Although Gulf Air does not yet fly passengers into the United States,[1] for all times relevant here it has maintained sales offices in the United States for the purpose of marketing its services to those wishing to travel routes serviced by Gulf Air.

On August 27, 1985, plaintiff filed a civil action in the Circuit Court of Cook County, Illinois. Named as defendants were Gulf Air, Gulf Aviation Services (Aviation Services) and three individuals. Aviation Services, a corporation licensed to do business in Illinois, had once acted as Gulf Air's general sales agent, but that relationship

---

1. In its brief, Gulf Air represented that it had recently obtained, but not yet exercised, the authority to fly to the United States in conjunction with Trans World Airlines.

ceased as of January 18, 1982. At the time the Illinois action was filed, there was, so far as this record shows, no contractual or ownership connection between Gulf Air and Aviation Services. One of the three individuals sued in the Illinois action, Michael Behou, was alleged to be Aviation Services' Executive Vice President. The remaining individual defendants in the Illinois action, Joseph Khoury and Hrach Azadian, were alleged to be executives of Gulf Air. The Illinois complaint, prolix and lacking in clarity, alleged against all five defendants malicious prosecution, slander, libel and, arguably, civil conspiracy to commit these torts. Damages of $1,002,500 were claimed, with $1,000,000 attributed to general damages and $2,500 attributed to the attorney's fees and other expenses incurred by plaintiff in defending herself against the allegedly unfounded and malicious accusations.

Plaintiff's allegations in the Illinois action may be summarized as follows:

(1) that Gulf Air and Aviation Services jointly owned, furnished and conducted an air freight sales business office in Chicago.

(2) that plaintiff, who worked in this office, was led to believe that she was jointly employed by Gulf Air and Aviation Services and that these entities, in turn, were jointly owned and operated.

(3) that in February, 1982, plaintiff received permission from defendant Hrach Azadian to sign his name in requesting complimentary tickets from TWA for travel to Cairo, Egypt or alternatively, Los Angeles, California for use in connection with plaintiff's planned honeymoon.

(4) that in August, 1982 Azadian told a TWA investigator (i) that plaintiff did not have authority to sign his name to a complimentary ticket request, (ii) that he had no knowledge of her requesting per-

mission to do so, and (iii) that plaintiff was not a Gulf Air employee.

(5) that based on this information, TWA notified the FBI which then began a criminal investigation.

(6) that Azadian repeated to an FBI agent the statements he had made to the TWA investigator and that, as a result, plaintiff was indicted by a federal grand jury on mail and wire fraud charges pursuant to 18 U.S.C. § 1343.

(7) that the indictment was dismissed after plaintiff retained counsel and underwent a polygraph examination, the results of which supported her version of the facts.

(8) that the false and malicious acts and statements of Azadian and Behou to TWA, the FBI and other authorities were duly authorized by Gulf Air and Aviation Services and caused substantial damage to plaintiff.

We turn next to the important facts concerning attempts to serve the Illinois complaint and the resulting default judgment. As noted, the Illinois action was filed on August 25, 1985. Two days later, the clerk of the Cook County Circuit Court issued a summons for service of the complaint on the C.T. Corporation, who plaintiff thought was Aviation Services' agent for service of process. On September 5, 1985, a deputy sheriff filed an affidavit averring that service of the complaint was effected on the C.T. Corporation as agent for Aviation Services. It also appears that the server was informed at the time by C.T. Corporation that it was no longer Aviation Services' authorized agent for service of process. Plaintiff made no effort to serve the complaint on Gulf Air, apparently because she was convinced that Gulf Air and Aviation Services were jointly owned, that she was jointly employed and that they were essentially the same company.[2] Plaintiff alleg-

---

**2.** Specifically, plaintiff claims that Gulf Air and Aviation Services were widely known throughout the travel industry as the same company. (Affidavit of LeDonne). In 1981, she claims Mr. Azadian hired her to manage the Chicago office of Aviation Services and Gulf Air. *Id.* She reported to Mr. Azadian who served as her supervisor and was allegedly promised by Mr. Azadian interline flight passes only available to direct employees of the airline. *Id.* During business dealings with customers, plaintiff and Mr. Azadian allegedly used similar business cards, made joint business calls, and distributed informational and promotional materials representing that Gulf Air and Aviation Services were the same company. *Id.* Significantly, however,

es, however, that Gulf Air received actual notice of the complaint. This occurred, plaintiff alleges, in a telephone conversation between plaintiff's Illinois counsel and Mr. Joseph Khoury of Gulf Air sometime after September 5, 1985. Specifically, plaintiff's counsel alleges that Mr. Khoury acknowledged the complaint and promised to "follow it up personally or through his attorney." (Affidavit of Haddad, ¶ 4).

The next pertinent event occurred on March 4, 1986. On this date the Cook County Circuit Court entered an Order of Default against Gulf Air and Aviation Services. Thereafter, the Clerk of the Court issued a summons for Gulf Air and Aviation Services for service on the Illinois Secretary of State in accordance with the Illinois long-arm statute. Ill.Rev.Stat. ch. 32 §§ 5.25(c), 5.30. With respect to Gulf Air, substitute service on the Secretary of State was apparently deemed appropriate because Gulf Air was allegedly was doing business in Illinois without having registered to do so. In any event, it is important to focus sharply on what the record discloses as to what happened to these summonses after issuance by the Illinois court.

There is abundant evidence that the Aviation Services summons reached the Secretary. The affidavit of compliance of service on the Secretary of State for Aviation Services is stamped "Secretary of State Corporation Dept.—Chicago May 2, 1986." The lower portion of the affidavit is stamped "Received May 8, 1986 Secretary of State." Further, the upper right hand corner of the affidavit has a space labeled "For use by the Secretary of State." This space is filled in with a file number, date and clerk's initials.

By contrast, the record does not reflect that the Gulf Air summons ever reached the Secretary. The affidavit of compliance for Gulf Air is not stamped "received" by the Illinois Secretary of State. Nor is the space in the upper right hand corner filled in. Although the deputy sheriff's affidavit of service dated May 5, 1986, alleges the service was completed for Gulf Air, an affidavit from the Office of Secretary of State states that no such service of process for Gulf Air was ever received.

Plaintiff's counsel also avers, by affidavit, that a copy of the summons and complaint were sent by registered mail to C.T. Corporation and to Michael Behou on behalf of Aviation Services, as required by Illinois law. *See* Ill.Rev.Stat. ch. 32 ¶ 5.25(c)(2) (Smith–Hurd Cum.Supp.1988). The return receipt indicates they were delivered on June 9, 1986. Plaintiff's counsel similarly avers that he caused a copy of the summons and the complaint to be sent by certified mail to Joseph Khoury, Gulf Air, Inc., 489 Fifth Avenue, New York, New York. Yet, unlike the parallel mailing to Aviation Services, plaintiff has not produced any return receipt to prove that the complaint and summons were ever delivered or received. Gulf Air denies ever receiving any written notice of the Illinois suit until this action was filed. In any event, the facts make clear that no attempt to serve the complaint on Gulf Air was made until after the entry of default.

Following all this, on June 29, 1987, a default judgment for $530,000 in damages was entered in the Cook County Circuit Court against Gulf Air and Aviation Services. So far as the record shows, plaintiff never succeeded in properly serving either the complaint or the default judgment on Gulf Air.

plaintiff's tenure with Aviation Services ended in March, 1982, and she had no further employment relationship with Gulf Air or Aviation Services after that period of time. She, therefore, had no first-hand knowledge of the relationship between Gulf Air and Aviation Services in 1985 or thereafter when service was allegedly attempted on Gulf Air.

As further proof, plaintiff offers the affidavits of three persons, each involved in the travel business for an extensive period of time. (Affi-

davits of Sheikh, Czike, and Goodgame). As with plaintiff's averments, however, each of the specific incidents recounted by Mr. Sheikh, Ms. Czike, and Mr. Goodgame occurred in 1981 or early 1982. Plaintiff offers no instances of Mr. Azadian or any other Gulf Air employee representing that the two companies were the same in 1985 or thereafter. Plaintiff's claim that Aviation Services was the same company as Gulf Air, or at least its agent, in 1985 is, therefore, unpersuasive.

We come now to the genesis of the instant suit. On April 25, 1988, plaintiff filed suit in the Arlington County Circuit Court to enforce the Illinois default judgment. That suit was properly removed to this Court. Gulf Air challenges both subject matter and personal jurisdiction. More specifically, Gulf Air contends it is immune from suit under the FSIA and hence this Court is without subject matter jurisdiction. Even if the FSIA does not confer immunity on Gulf Air in this case, Gulf Air claims the Illinois judgment is defective because it was never served with the complaint in the manner required by the FSIA or indeed, in any other manner. Gulf Air's final contention is that failure of plaintiff to serve the default judgment on Gulf Air as required by the FSIA is fatal to plaintiff's claim. *See* 28 U.S.C. § 1608(e). Given these facts, the following questions are presented:

(1) Is Gulf Air an "agent or instrumentality of a foreign state" such that the FSIA is applicable?

(2) If so, is Gulf Air entitled to the Act's sovereign immunity or is the activity on which the Illinois action is based of such a nature as to call into play one of the Act's exceptions?

(3) If the FSIA applies but one of its exceptions deprives Gulf Air of immunity, the next question is whether the Illinois Court lacked personal jurisdiction because plaintiff failed to serve Gulf Air pursuant to the FSIA's requirements?

(4) Finally, if the FSIA applies, but does not confer immunity on Gulf Air, is plaintiff's claim nonetheless fatally defective given plaintiff's admitted failure to serve the default judgment on Gulf Air as the FSIA requires?

*Analysis*

**A. Applicability of the FSIA**

■ Congress enacted the FSIA in 1976 to define the circumstances under which lawsuits can be maintained against a foreign state or its instrumentalities in the courts of the United States.[3] Specifically, the Act codifies what had come to be known as the "restrictive" principle of sovereign immunity.[4] Simply put, this principle limits the grant of sovereign immunity only to the public acts of a foreign state. In the words of the House Report accompanying the FSIA, "the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (*jure imperii*) and does not extend to suits based on its commercial or private acts (*jure gestionis*)."[5] The threshold question here is the applicability of the Act. If applicable, the FSIA holds out the possibility of immunity for Gulf Air depending upon whether the underlying nature of the Illinois action is commercial activity. *See* 28 U.S.C. § 1603(d). In any event, the Act imposes specific service requirements that are fatal if ignored.

■ The FSIA applies to a "foreign state" which is, in turn, defined to include an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Gulf Air is plainly not a "foreign state," but it may be an "agency or instrumentality of a foreign state." Section 1603(b) defines this latter phrase and hence determines whether the FSIA applies to Gulf Air. Three criteria must be met. Gulf Air qualifies as an "agency or instrumentality of a foreign state" if it is

(1) ... a separate legal person, corporate or otherwise, and

**3.** For a history of the FSIA as well as a drafter's perspective, see Feldman, *The United States Foreign Sovereign Immunities Act of 1976 In Perspective: A Founder's View,* 35 Int'l & Comp.L.Q. 302 (1986).

**4.** *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.Code & Cong. & Admin. News 6604, 6605; *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489, 103 S.Ct. 1962, 1969, 76 L.Ed.2d 81 (1983). This "restrictive" sovereign immunity principle had previously been adopted by the U.S. Department of

State in 1952. H.R.Rep. No. 1487, *supra,* at 7, *reprinted in* 1976 U.S.Code Cong. & Admin. News at 6605; *Verlinden B.V.,* 461 U.S. at 487–88, 103 S.Ct. at 1968–69. *See generally* Note, *Two Faces of the Trader: Guidelines for Distinguishing Between Governmental and Commercial Acts Under the Foreign Sovereign Immunities Act of 1976,* 23 Tex.Int.L.J. 465 (1988) [hereinafter Note, Two Faces of the Trader].

**5.** *Id.* at 6605.

(2) ... an organ of a foreign state ... or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) ... neither a citizen of the United States as defined in Section 1332(c) and (d) of [Title 28], nor created under the laws of any third country.

28 U.S.C. § 1603(b). Undisputed in the record is that Gulf Air is a corporation established by treaty. As such, Gulf Air is plainly "a separate legal person" whose ownership interest is owned by four foreign states. It is, therefore, neither a citizen of the United States, nor created under laws of any third country. Accordingly, Gulf Air seems to fall squarely within the statutory definition of an "agency or instrumentality of a foreign state."

Plaintiff disagrees and advances three arguments against this conclusion. All are ultimately unpersuasive. First, defendant argues that Gulf Air fails to meet the statutory test because it is an instrumentality owned equally by four foreign states, not one which has a majority of its shares "owned by a foreign state." 28 U.S.C. § 1603(b)(2). In plaintiff's view, the FSIA does not apply unless majority ownership vests in a single foreign state. This is an unnecessary literalism that runs counter to the Act's purpose and ignores the well-established international practice of states acting jointly through treaty-created entities for public or sovereign purposes.[6] If the policies that animate the FSIA are to be given their full range, it must, therefore, apply to treaty-created instrumentalities jointly owned by foreign states.

Next, plaintiff argues that Gulf Air does not fit the definition of an "agency or instrumentality of a foreign state" because

its articles of incorporation apparently allow the sale of Gulf Air shares to private citizens of the four treaty partners. This point is simply irrelevant; what matters is the status of Gulf Air at the times relevant to this dispute, not what might occur in the future. It may be that at some future time private individual ownership interests would preclude the application of the FSIA to Gulf Air. This future possibility does not, however, preclude FSIA applicability on the basis of the ownership facts as they existed at the times pertinent here.

■ Finally, plaintiff contends that the FSIA does not apply because Gulf Air is governed by the laws of the four treaty partners and hence is "created under the laws of any third country." 28 U.S.C. § 1603(b)(3). Again plaintiff is wide of the mark. The rationale of this FSIA exclusion is the common sense presumption that when a foreign state establishes a company under the laws of yet another foreign state or acquires a company created by another country, the intention is to engage in private commercial activity, not public, noncommercial activity. The key to the presumption's validity is that the instrumentality is created or established in a country different from the owner nation. Here, however, this is not the case; Gulf Air is created under the laws of the owner nations, not under the laws of any other, third countries. In sum, the Section 1603(b) criteria are met; Gulf Air is an instrumentality of a foreign state; the FSIA is therefore applicable.

### B. Immunity under the FSIA

Next in the logical progression of issues is whether the Act confers immunity on Gulf Air for the acts alleged in the Illinois

---

**6.** Courts have held that similar multinational organizations fall within the scope of the FSIA. *See, e.g., Rios v. Marshall,* 530 F.Supp. 351, 371 (S.D.N.Y.1981) (British West Indies Central Labour Organization, an administrative arm of the Caribbean Regional Labour Board, is an instrumentality of its eleven member states under the FSIA); *Int'l Assoc. of Machinists and Aerospace v. OPEC,* 477 F.Supp. 553, 568–69 (C.D.Cal.1979) (activities of OPEC in setting crude oil prices were governmental by nature and, therefore, immune under the FSIA). Significantly, at least

one other court has found Gulf Air (formerly known as Gulf Aviation Ltd.) to be an instrumentality of foreign governments within the FSIA. *See Aboujdid v. Singapore Airlines, Ltd. and Gulf Aviation Ltd.,* 18 Avi.Cas. (CCH) ¶ 18,059, ¶ 18,060 (N.Y.Sup.Ct. June 11, 1984), *rev'd in part on other grounds,* 67 N.Y.2d 450, 503 N.Y.S.2d 555, 494 N.E.2d 1055 (N.Y.Ct.App. 1986). *See generally* L. Henkin, R. Pugh, O. Schachter, & H. Smit, *International Law* 216–32 (1980) (discussing the role of international organizations in international law).

action. If so, then the Illinois court, and this one as well, lack subject matter jurisdiction under 28 U.S.C. § 1330(a).[7] In this event, of course, there is no need to examine the service of process issues involved in the question of personal jurisdiction. In the words of the FSIA's drafters, "[f]or personal jurisdiction to exist under Section 1330(b), the claim must first of all be one over which the district courts have original jurisdiction under Section 1330(a), meaning a claim for which the foreign state is not entitled to immunity." H.R.Rep. No. 1487, 94th Cong., 2d Sess., at 13, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6612. *See* 28 U.S.C. § 1330(b). *Accord Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 n. 5, 490 & n. 14, 103 S.Ct. 1962, 1967 n. 5, 1969 & n. 14, 76 L.Ed.2d 81 (1983) (subject matter and personal jurisdiction depend on substantive application of FSIA); *Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329, 331 (9th Cir.) (absence of sovereign immunity is jurisdiction requirement), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984). Accordingly, the service of process issues under Section 1608 are properly postponed while we turn next to the question of immunity, focusing sharply on whether the activities underlying the claims in the Illinois case are commercial rather than governmental in nature.

■ The heart of the FSIA is the distinction it makes between commercial and governmental activity, with the former being the principal exception to the grant of immunity. See 28 U.S.C. § 1605(a)(2). In defining this distinction, Congress did not draw a precise bright line; instead, it chose general, almost question-begging, terms coupled with an instruction to focus on the nature of the acts, not their purposes.[8] Thus, Section 1603(d) states as follows:

(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

■ By resorting to a general definition, Congress has effectively delegated to the courts the task of drawing the precise line on a case by case basis. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 498, 103 S.Ct. 1962, 1973, 76 L.Ed.2d 81 (1983).[9] But in so doing, Congress offered scant guidance.[10] Not surprisingly,

---

**7.** This link between immunity and jurisdiction stems from the fact that immunity should shield a defendant from the burden of defending, as well as from any resulting liability. *See Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).

**8.** The drafters emphasized the primacy of purpose by noting that

[T]he fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the *essentially* commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function. H.R.Rep. No. 1487, *supra* note 4, at 16, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 6615. (emphasis added).

**9.** One commentator notes that the rationale for this delegation was the desire to remove sovereign immunity decisions from the unpredictable political sphere. *See* Note, *Two Faces of the Trader, supra* note 4, at 475.

**10.** Apart from making clear that the nature of acts, not their purpose, is the touchstone, Congress chose to do little more than offer various illustrations of commercial activities, including,

a foreign government's sale of a service or a product, its leasing of property, its borrowing of money, its employment or engagement of laborers, ... its investment in a security of an American corporation, ... [or] the carrying on of a commercial enterprise such as a mineral extraction company, an airline or a state trading corporation.

*See* H.R.Rep. No. 1487, *supra* note 4, at 16, *reprinted in* 1976 U.S.Code Cong. & Admin. News at 6614–6615. In the words of one court, "[t]he FSIA provides distressingly little guidance to determine whether a given activity is commercial or public." *Gregorian v. Izvestia*, 658 F.Supp. 1224, 1232 (C.D.Cal.1987) (holding Soviet newspaper immune under FSIA from libel claim even though allegedly libelous remarks grew out of contractual claims by American broker).

therefore, courts have struggled with this issue, occasionally reaching confusing or inconsistent results.[11] After reviewing the decisions on this issue,[12] this Court is persuaded that the "private party" test in *Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), is the key to the proper application of Section 1603(d). There, the government of Nigeria ordered large quantities of cement for a government project, but refused to pay on delivery. Nigeria asserted sovereign immunity in the cascade of lawsuits that followed. The Second Circuit denied immunity. Citing the legislative history, the court there held that "if the activity is one in which a private party could engage, [the Sovereign] is not entitled to immunity." 647 F.2d at 309. Under this test, the immunity question turns on whether the activity in question could be legally engaged in by a private party as well as a government, or whether it could only be appropriately pursued by a government. Immunity attaches only in the latter case. It follows, of course, that proper application of this "private party" test requires a sharp and accurate focus on the specific activity in question.[13]

11. *See*, Comment, *The Foreign Sovereign Immunities Act: Defining Commercial Activity and Direct Effects Jurisdiction*, 25 Santa Clara L.Rev. 105, 108 (1985) ("Some confusion [exists] with regard to the determination of what constitutes a 'commercial activity'"). The quintessential example is the litigation that grew out of a disastrous oil spill from an exploratory offshore oil well drilled by Petroleos Mexicanos (Pemex), a Mexican governmental agency. The spill caused damage and personal injuries along the Gulf Coast, and a number of plaintiffs sued Sedco, the American company that furnished the oil rig. Sedco, in turn, sued Pemex for contribution and indemnity, and other parties also sued Pemex directly. Pemex claimed sovereign immunity under the FSIA. The District Court initially agreed, pointing out that oil exploration was part of the Mexican government's long range planning and policy-making process concerning natural resources. *In re Sedco, Inc.*, 543 F.Supp. 561 (S.D.Tex.1982). Two years later, the Court changed its mind; it then concluded that there was a general factual issue on whether the well was drilled for commercial exploitation. 610 F.Supp. 306 (S.D.Tex.1984), *remanded*, 767 F.2d 1140 (5th Cir.1985). *See also Gittler v. German Information Center*, 95 Misc.2d 788, 408 N.Y.S.2d 600 (1978), where plaintiff, a performer in documentary films, was barred by immunity from recovery for breach of his performance contract because the films were said to have a political purpose and to have been the result of a state political decision.

12. For examples of cases in which courts have found the commercial activity exception applicable, *see, e.g., McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341 (8th Cir.), *cert. denied*, 474 U.S. 948 (1985) (claims based on contract by Iran to buy equipment for armed services are based on commercial activity; governmental purpose for that equipment does not change the nature of the activity); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1109 (5th Cir. 1985) (foreign bank's sale of certificates of deposit and subsequent payment constitutes commercial activity); *TransAmerican Steamship Corp. v. Somali Democratic Republic*, 767 F.2d 998 (D.C.Cir.1985) (actions of Somali government to assist its instrumentality in demanding and securing payment from shipping company that was allegedly not owed by the company are commercial in nature); *Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) (claims arising out of foreign country's breach of contracts to purchase cement fall within commercial activity exception to immunity); *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371 (5th Cir. 1980) (breach of contract and warranty claims against airline owned by Dominican government were based on commercial activity; in contrast, claims resulting from airline's "involuntary re-routing" of passengers at direction of Dominican government were not).

For examples of cases in which the commercial activity exception has been held inapplicable, *see, e.g., MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918 (D.C.Cir.1987) (operation of chancery by government of Peru is not commercial activity); *Letelier v. Republic of Chile*, 748 F.2d 790 (2nd Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985) (claims arising out of politically-motivated assassination were not based on commercial activity because private person could not lawfully engage in assassination). *Cf. Tuck v. Pan American Health Organization*, 668 F.2d 547 (D.C.Cir.1981) (former employee's claims against international organization for breach of contract, racial discrimination, and interference with his attorney-client relationships with other employees not based on commercial activity); *Broadbent v. Organization of American States*, 628 F.2d 27 (D.C.Cir.1980) (claim arising out of allegedly improper discharge from international organization not based on commercial activity).

13. *See de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385 (5th Cir.1985) where the court put this point in the following terms:

The "private party" test is wholly consistent with the letter and theory of the Act. It is unclear, however, whether the test is sufficient to distinguish between public and commercial acts given the wide variety of foreign state instrumentalities and the equally rich variety of activities in which they might engage.[14] Consistent with the Act's legislative history, it seems appropriate, in addition to the private party test, to ask as a check whether the activities in question are "customarily carried on for profit." H.R.Rep. No. 1487, *supra,* at 16, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 6615. If so, the activities are commercial in nature even though engaged in by governments or their instrumentalities.

■ Application of the "private party" test to the case at bar points decidedly in the direction of commercial activity. Plaintiff's Illinois action alleged that Gulf Air made maliciously false statements to TWA, the FBI and other authorities to the effect that plaintiff had no authority to use the name of Gulf Air or any of its employees for the purpose of obtaining complimentary air travel tickets. This activity is manifestly private and commercial; it is activity in which a private person or airline can engage and indeed, customarily does so in connection with its commercial, for-profit airline activities. Authorizing or refusing to authorize the issuance of complimentary air travel tickets is indisputably part of the business of private commercial airlines. Reports to the authorities and to other airlines concerning unauthorized attempts to obtain complimentary air travel tickets is similarly part of the business of private commercial airlines.[15] As such, they are activities which, in combination with all the other activities of private airlines, are activities customarily carried on for profit. The obverse of this coin is equally clear. None of the acts alleged in the Illinois action can fairly be viewed as activities governments engage in solely in their sovereign capacity. In sum, then, the Gulf Air activities alleged in the Illinois action are private and commercial in nature; they are activities for which FSIA's Section 1605(a)(2) confers no immunity on Gulf Air.

*Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371 (5th Cir.1980), provides instructive support for this conclusion. There, the government airline, Dominicana, cooperated with other entities in creating a tour package which plaintiffs purchased. But when plaintiffs arrived in the Dominican Republic, they were refused entry because they were on that government's list of undesirables. Accordingly,

---

In ascertaining whether the commercial activity exception applies, ... [f]irst, we must define *with precision* the relevant activity. This requires focusing on the acts of the named defendant, not on other acts that may have had a casual connection with the suit. In particular, we must isolate those *specific acts* of the named defendant that form the basis of plaintiff's suit.

*Id.* at 1391 (citation omitted) (emphasis added). *See also Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1109 (5th Cir.1985) ("[T]he focus should be on the elements of the cause of action itself: Is the gravamen of the complaint a sovereign activity by defendant?").

**14.** Differences in political systems help create this variety. For example, unlike businesses and the press in this country, state-owned businesses and the press in some socialist or communist states act as arms of the government in pursuing government ordained goals. It is not always clear how this circumstance might affect application of FSIA. *See, e.g., Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371 (5th Cir.1980) (airline owned by Dominican government immune from tort claims stemming from involuntary re-routing of passengers, but not immune from breach of contract claims); *Gregorian v. Izvestia,* 658 F.Supp. 1224, 1232 (C.D. Cal.1987) (Soviet state-owned newspaper entitled to FSIA immunity from libel action); *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849 (S.D.N.Y.1978) (Soviet news agency immune under FSIA).

**15.** The commercial context of activity is persuasive evidence that the activity itself is commercial. *See* H.R.Rep. No. 1487, *supra* note 4, at 16, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 6615; *see also Aboujdid v. Singapore Airlines, Ltd. and Gulf Aviation, Ltd.,* 18 Avi.Cas. ¶ 18,059, § 18,061 (N.Y.Sup.Ct. June 11, 1984), *rev'd in part on other grounds,* 67 N.Y.2d 450, 503 N.Y.S.2d 555, 494 N.E.2d 1055 (N.Y.Ct. App.1986) (In a suit against Gulf Air and another airline, the court held that Gulf Air was a commercial instrumentality of its governments and noted that Gulf Air "concede[s] that [it was and is] engaged in commercial activity for a profit.")

they were forced to reboard the aircraft and depart. Dominicana then refused to reimburse plaintiffs. Thereafter, plaintiffs sued for breach of contract and warranty based on failure to perform the tour package and for the torts of false imprisonment and battery for forcing them, against their will, to reboard the aircraft and fly to an unwanted destination. On these facts, the Fifth Circuit permitted the breach of contract and warranty claims for non-performance, but barred the tort claims. The latter, according to the court, were public, not commercial acts. Dominicana, in taking plaintiff's to another destination against their will, merely acted as an arm of the state in enforcing its immigration laws. By contrast, the contract and warranty claims involved garden-variety commercial activity for which Dominicana could not claim immunity under the FSIA. Like Dominicana's refusal to reimburse plaintiffs for the nonperformance of the tour package, Gulf Air's involvement in the complimentary tickets imbroglio is essentially private, commercial activity.

■ The conclusion that Gulf Air's alleged acts were commercial in nature means that Section 1605(a)(2) applies to deny immunity for those acts. But this does not end the immunity inquiry. Gulf Air argues that notwithstanding this conclusion immunity should still apply under Section 1605(a)(5)(B).[16] The argument has some superficial plausibility, but ultimately must fail because it flies directly in the face of contrary statutory language. Section 1605(a)(5)(B) applies only in those instances "not otherwise covered in paragraph (2)." In other words, foreign states enjoy immunity from claims for libel, slander, malicious prosecution and misrepresentation *only* when the foreign state is en-

gaged in governmental activities. Immunity does not attach under Section 1605(a)(5)(B) where, as here, the activity is commercial in nature. Two decisions support this view of Section 1605(a)(5)(B). In *Gilson v. Republic of Ireland,* 682 F.2d 1022, 1028 n. 27 (D.C.Cir.1982), the D.C. Circuit noted in dictum that subsection (a)(5)(B) does *not* limit Subsection (a)(2). In other words, no immunity attaches to acts of slander, libel, etc. in a commercial context. Similarly in *Yessenin Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 855 (S.D.N.Y.1978), the district court noted that Tass, the Soviet news agency, would be immune from liability for libel unless "the acts alleged are within the scope of subsection (a)(2)."

One court, however, has reached a contrary result. In *Gregorian v. Izvestia,* 658 F.Supp. 1224 (C.D.Cal.1987), the court concluded that the operation of subsection (a)(5)(B) was not limited to governmental activities. Because the subsection tracked the language of the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680, that court also concluded that Congress intended that foreign states be immune from libel claims to the same extent the United States is itself immune under the FTCA. Any other result, it noted, would create a libel "loophole" and a "double standard." 658 F.Supp. at 1234. It may be that Congress, in fact, intended to immunize foreign states from claims for libel, slander, and the like, even in commercial circumstances, because the FTCA does so for the United States. If so, and if the statutory language permitted, this Court might well agree with *Gregorian.* In fact, however, there is no explicit manifestation of any such legislative intent, and moreover, the statutory language flatly precludes the construction accepted in *Gregorian.*

**16.** Section 1605(a)(5)(B) states, in pertinent part, as follows:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> . . .
> (5) *not otherwise encompassed in paragraph (2)* [the commercial activities exception to immunity], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the

> tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply—
> . . .
> (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.
> (emphasis added).

In summary, the Gulf Air acts alleged in the Illinois action are commercial in nature and hence are outside the FSIA's grant of immunity. And subsection (a)(5)(B) does not save Gulf Air for it operates only where, as is not true here, the foreign state's acts are governmental, not commercial. This Court, therefore, has subject-matter jurisdiction over plaintiff's claim. *See* 28 U.S.C. § 1330(a); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 n. 5, 103 S.Ct. 1962, 1967 n. 5, 76 L.Ed.2d 81 (1983); *accord Texas Trading & Milling Corp.*, 647 F.2d at 308, 313; *Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 277 (2d Cir. 1984). We turn next to the service of process and default judgment issues, for the FSIA's requirements in this connection apply whether or not immunity is conferred by the Act.

### C. FSIA Service of Process and Default Requirements

■ The FSIA establishes its own special set of rules for serving process and default judgments on foreign states and their instrumentalities.[17] Failure to observe these rules can be fatal to a claim. The Illinois court's proper assertion of personal jurisdiction over Gulf Air depends, therefore, on strict compliance with the FSIA's service rules.[18] In the case at bar, Gulf Air's claim of improper service is twofold. First, Gulf Air alleges that it did not receive proper notice of the original complaint before the entry of default and the default judgment. Second, it was allegedly never served with a copy of the default judgment, as required by 28 U.S.C. § 1608(e). The failure of either aspect of service deprives this court of personal jurisdiction under the FSIA. Each is separately addressed.

■ For service of a summons and complaint on a foreign state's agencies or instrumentalities, the Act provides three alternative procedures.[19] If the plaintiff and instrumentality have a special arrangement for service, delivery of the summons and

17. The Act establishes different procedures for service depending on whether the party is a foreign state or an agency or instrumentality of a foreign state. Section 1608(a) sets forth the rules for service on foreign states. Section 1608(b) establishes the procedures, relevant here, for service on agencies or instrumentalities of a foreign state. It provides as follows:

(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

18. Plaintiff bears the burden of demonstrating personal jurisdiction once the exercise of jurisdiction has been questioned. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Haynes v. James H. Carr, Inc.*, 427 F.2d 700, 704 (4th Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 238, 27 L.Ed.2d 245 (1970). Proper notice of an action, which service of process is designed to ensure, is a fundamental prerequisite for personal jurisdiction. *Cf.* C. Wright & A. Miller, 4 *Federal Practice and Procedure* §§ 1063, 1064 (1987) (federal service requirements are primarily designed to ensure fair notice to the defendant of the lawsuit; proper service gives court power to summon defendant to appear before it to adjudicate the claim, while failure to serve results in the claim's dismissal).

19. Section 1608(b) applies by its terms to service of the summons and complaint. Section 1608(e) incorporates this scheme as the requirements of proper service of default judgments, providing, in pertinent part, that "[a] copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section." 28 U.S.C. § 1608(e).

complaint must be effected in accordance with that arrangement. 28 U.S.C. § 1608(b)(1). Here, no such arrangement exists; this method is, therefore, inapplicable.

Absent such an arrangement, the Act provides for delivery of the summons and complaint "either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States...." 28 U.S.C. § 1608(b)(2).[20] Plaintiff does not contend that the complaint was served on any officer of Gulf Air before the entry of default on March 4, 1986; no officers were even located in the United States at that time. The highest ranking United States employee was Mr. Joseph Khoury, a general manager for Gulf Air, who was located in New York City. Although plaintiff alleges that Mr. Khoury was served at some point as a managing agent of Gulf Air, no receipt has been produced to verify that service.[21] On this point, therefore, plaintiff has failed to carry her burden. The Court does not accept that such service was effected on Gulf Air. Plaintiff claims, however, that Mr. Khoury received actual notice of the complaint. As proof, her Illinois counsel avers, by affidavit, that Mr. Khoury telephoned him after the summons and complaint were allegedly served in September, 1985. *See* Affidavit of Haddad, ¶ 4. In that conversation, Mr. Khoury allegedly "acknowledged the complaint and ... promised to follow it up personally or through his attorney."[22] *Id.* Even were this single alleged contact sufficient to establish actual notice, how-

ever, it does not satisfy the explicit service requirements of the FSIA and is, therefore, inadequate to demonstrate that Gulf Air was properly served under the FSIA.[23]

 Notwithstanding the lack of proof of service on Gulf Air, plaintiff's counsel certified to the Illinois court on March 4, 1986, that process had been properly served on Gulf Air. No date for the alleged service, however, was given in the space provided on the certification form. That representation was apparently incorrect; no evidence produced by plaintiff confirms any such service. Plaintiff claims, in the alternative, that service on Aviation Services, an alleged agent of Gulf Air, through C.T. Corporation, an alleged agent of Aviation Services, constituted effective service on Gulf Air. The notation of plaintiff's counsel on the March 4 certification form also claimed that Aviation Services had been served on September 5, 1985, the date on which service was made on C.T. Corporation as Aviation Services' agent. The claim is, however, invalid; that service was defective. C.T. Corporation's responsibilities as Aviation Services' agent had terminated as of December 1, 1982. Moreover, the process server had been informed by C.T. Corporation representatives of that termination, as the receipt copy of the service clearly indicates. Plaintiff's claim of service on Gulf Air through Aviation Services is, therefore, without merit. Even if Aviation Services were an agent of Gulf Air, plaintiff's failure to properly serve Aviation Services before the Order of De-

20. Section 1608(b)(2) also allows service "in accordance with an applicable international convention on service of judicial documents...." Plaintiff does not contend that the service here complied with any such international convention or agreement.

21. Section 1608(c)(2) provides that "[s]ervice shall be deemed to have been made ... as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed." Plaintiff here has failed to offer any proof that process was received.

22. There was apparently no further contact between Khoury and plaintiff. Plaintiff's counsel

asserts that he tried to contact Mr. Khoury at a later date, but did not reach him. The only other Gulf Air official named in the record is Mr. Hrach Azadian, a Regional Sales Manager for the Midwest region. No evidence was presented to suggest that service was attempted on Mr. Azadian as a managing or general agent of Gulf Air.

23. As one commentator has noted, strict compliance with the FSIA's service provisions is essential to ensure "the uniformity of results that Congress sought to achieve." George, *A Practical and Theoretical Analysis of Service of Process under the Foreign Sovereign Immunities Act,* 19 Int'l Law. 49, 61–65 (1985) (and cases cited therein).

fault constitutes a failure to serve Gulf Air.[24]

Based on that improper certification of service, however, the Illinois court entered on Order of Default against Gulf Air and Aviation Services on March 4, 1986. Once again, plaintiff sought unsuccessfully to serve Gulf Air through the Secretary of State of Illinois.[25] On April 25, 1986, plaintiff allegedly served the Secretary of State a copy of the process to be served on Gulf Air. The Deputy Sheriff's Affidavit of Service asserts that service was completed on May 5, 1986. The Secretary, however, apparently never received that copy of the process. Significantly, the Secretary's Affidavit of Compliance is free from marks of any kind verifying its proper receipt in the Secretary's office. Specifically, no receipt stamps indicate the date of receipt by the Secretary's office. The Affidavit form similarly fails to indicate the date of service, the initials of the clerk processing the request, the assigned file number, or the payment of the required fee. A representative of the Secretary's office confirmed, by affidavit dated May 9, 1988, that his office has no record of any receipt or service of the summons for Gulf Air from January 1, 1986, until the present time. Plaintiff also allegedly sent, by certified mail, notice of service on the Secretary of State to Mr. Khoury in New York, as required by Illinois law. *See* Ill.Ann.Stat. ch. 32 ¶ 5.25 (Smith–Hurd Cum.Supp.1988).

No receipt, however, has been produced to verify delivery of that notice.

In sharp contrast, abundant evidence verifies that service through the Secretary of State for Aviation Services was completed.[26] The Affidavit of Compliance form is stamped received on May 8, 1986, the clerk initialed the appropriate line, the statutory fee is marked as paid, and a file number was assigned. Moreover, receipts were produced to verify that both C.T. Corporation and Mr. Michael Behou of Aviation Services received copies of plaintiff's notice of service on the Secretary on June 6 and 9, 1986, respectively. Given these facts, the Court concludes that plaintiff has not carried her burden on this matter. Specifically, the Court is persuaded on this record that process directed to Gulf Air was not served on the Secretary and, hence, neither the Illinois statute nor the FSIA were complied with.

Apparently admitting the lack of direct service on Gulf Air, plaintiff alleges that service on Aviation Services was sufficient service on Gulf Air because Aviation Services was Gulf Air's agent. To be sure, Aviation Services was, at one time, a general sales agent for Gulf Air, but that relationship was officially terminated in January, 1982. *See* Affidavit of Iman, ¶ 4. No other evidence was produced to demonstrate that Aviation Services was ever owned by Gulf Air or that the two companies ever shared the same owners or directors. Notwithstanding the lack of for-

---

**24.** It is also worth noting that the summons served on C.T. Corporation for Aviation Services was not directed in any way to Gulf Air or even to Aviation Services as an *agent* for Gulf Air. Under Rule 4 of the Federal Rules of Civil Procedure, the summons must, *inter alia*, "be directed to the defendant" in order to be valid. Rule 4(b), Fed.R.Civ.P. Thus, even if Aviation Services were Gulf Air's agent for service purposes, service on Aviation Services of a summons directed only to Aviation Services would be insufficient to constitute service on Gulf Air.

**25.** Where, as here, a foreign corporation is transacting business in Illinois without registering an agent for purposes of service, Illinois law permits a plaintiff to obtain long-arm jurisdiction by serving the Secretary of State. *See* Ill. Ann.Stat. ch. 32 ¶ 5.05(b) (Smith–Hurd 1985) (requiring that foreign corporations doing business in Illinois maintain, *inter alia*, a registered

agent); Ill.Ann.Stat. ch. 32 ¶ 5.30 (Smith–Hurd Cum.Supp.1988) (designating the Secretary of State as agent, for purposes of service, for foreign corporations doing business in Illinois without proper certification). Gulf Air, as the Illinois court found, had failed to register an agent or to obtain a certificate of authority to do business in Illinois. The Illinois Secretary of State, therefore, serves as Gulf Air's agent by law.

**26.** Aviation Services was apparently licensed to do business in Illinois. Section 5.25 of the Illinois Business Corporation Act provides that service upon a foreign corporation with such a certificate of authority to transact business may be made upon *either* its registered agent or the Secretary of State. *See* Business Corporation Act, § 5.25, *codified in* Ill.Ann.Stat. ch. 32 ¶ 5.25 (Smith–Hurd Cum.Supp.1988).

mal ties, plaintiff claims that Gulf Air and Aviation Services held themselves out to be agents one of the other. As it happens, however, a final determination of the nature of this relationship is not necessary to disposition of the issues presented. The record clearly reveals that plaintiff made no attempt to serve a summons for Gulf Air on Aviation Services or even for Aviation Services as an agent of Gulf Air. The only successful service on Aviation Services occurred through the Secretary's office after the entry of an Order of Default. That process was directed to Aviation Services as a defendant in plaintiff's suit, not to Aviation Services as agent for Gulf Air, a second defendant to the same suit. Thus, plaintiff failed to serve the summons and complaint on Gulf Air through "an officer, a managing or general agent, or to any other agent authorized by appointment or law," as provided in section 1608(b)(2).

Plaintiff similarly failed to satisfy the third method for service under the FSIA. Specifically, § 1608(b)(3) authorizes service,

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

28 U.S.C. § 1608(b)(3). Here, no translation of the summons and complaint were served, or even prepared, to satisfy this alternative method of service.

Plaintiff's failure to serve Gulf Air a copy of the summons and complaint deprives the Illinois court of personal jurisdiction over Gulf Air. The entry of default and subsequent default judgment were, therefore, fatally flawed. Accordingly, this Court does not have the power to enforce a judgment in which the adjudicating court lacked personal jurisdiction over the defendant.

Plaintiff likewise concedes her failure to serve, or even attempt to serve, a copy of the default judgment on Gulf Air or Aviation Services. This undisputed fact, by itself, is dispositive. The FSIA mandates that a copy of the default judgment be served on the foreign agency or instrumentality in accordance with the procedures outlined in section 1608(b). *See* 28 U.S.C. §§ 1608(b), 1608(e). Plaintiff's failure to do so directly contravenes the requirements of the FSIA and, therefore, deprives this Court of the power to enforce the Illinois judgment. 28 U.S.C. §§ 1330(b) and 1608(e).[27] Accordingly, defendant's motion for summary judgment is granted.

An appropriate order will be entered.

---

27. An additional FSIA requirement is that plaintiff seeking a valid default judgment must establish "his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The record reflects only that the Illinois court was "fully apprised of the premises [for the default judgment] by prove-up." *LeDonne v. Gulf Aviation Services, Inc., et al.,* No. 85–L–20824 (Ill.Cir.Ct. June 29, 1987) (Order of judgment of damages). Gulf Air argued that this "prove-up" was insufficient to satisfy the statutory requirement. Plaintiff failed to explain, in briefs or in oral argument, in what manner a "prove-up" satisfies the FSIA requirement. The Court's rulings here make it is unnecessary to reach this issue.